**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Airborne Athletics, Inc.,                                    Civil No. 10-3785 (SRN/JJK)

               Plaintiff,

                                                 **MEMORANDUM OPINION**
     v.                                                                      **AND ORDER**

Shoot-A-Way, Inc.,

               Defendant.
_____

David R. Fairbairn, Catherine Schultz and Stuart A. Nelson, Kinney & Lange, PA, 312 South
Third Street, Minneapolis, Minnesota 55415, for Plaintiff

Alan W. Kowalchyk, Eric R. Chad and Heather Kliebenstein, Merchant & Gould, PC, 80 South
Eighth Street, Suite 3200, Minneapolis, Minnesota 55402, for Defendant
_____

SUSAN RICHARD NELSON, United States District Judge

      This matter is before the Court on Plaintiff's Motion for Claim Construction [Doc. No.

25].

**I.    BACKGROUND**

      This litigation involves allegations by Plaintiff Airborne Athletics, Inc. ("Airborne") that

Defendant Shoot-A-Way, Inc. is infringing one or more claims of U.S. Patent No. 5,776,018 (the

"'018 Patent"). The '018 Patent relates to a basketball collection, passing and shot analysis

machine. The parties disagree as to the meaning of several terms in the Patent-in-Suit.

      Patent claim construction, i.e., the interpretation of the patent claims that define

the scope of the patent, is a matter of law for the court. Markman v. Westview Instruments, Inc.,

52 F.3d 967, 970-71 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1999). Proper claim construction

requires an examination of the intrinsic evidence of record, including the claim language, the

specification, and the prosecution history.  Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).  The starting point for claim construction is a review of the words of the claims themselves.  Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citation omitted); see also Vitronics, 90 F.3d at 1582 ("First, we look to the words of the claims themselves, both asserted and unasserted, to define the scope of the patented invention.").  The words of a claim generally carry "the meaning that the term would have to a person of ordinary skill in the art at the time of the invention." Phillips, 415 F.3d at 1313.  Claims must also be read in view of the specification.  Id. at 1315.  The specification is "the single best guide to the meaning of a disputed term."  Id. (citing Vitronics, 90 F.3d at 1582.)  The specification may prescribe a special definition given to a claim term or a disavowal of claim scope by the inventor.  Id. at 1316.  In such cases, the inventor's intention that is expressed in the specification is dispositive.  Id.  The Court may not, however, import limitations from the specification into the claims.  Id. at 1323.

The Court should also consider the patent's prosecution history, which provides evidence of how the United States Patent and Trademark Office ("USPTO") and the inventor understood the patent.  Id. at 1317.  The court may, in its discretion, consider extrinsic evidence, though such evidence is less reliable than intrinsic evidence.  Id. at 1317-18.  In most situations, however, intrinsic evidence will resolve any ambiguity in a disputed term, and when it does so, it is improper to rely on extrinsic evidence.  Vitronics, 90 F.3d at 1583.  The court may use a dictionary or technical treatise to "assist in understanding the commonly understood meaning" of a term, so long as any meaning found in such sources does not contradict the definition that is found in the patent documents.  Phillips, 415 F.3d at 1322-23.

## II.   The '018 Patent

The '018 Patent, entitled "Basketball Collection, Passing and Shot Analysis System" was

issued on July 7, 1998.  The Abstract of the Patent reads:

> A basketball passing machine includes a basketball supply which provides
> basketballs for a basketball ejector assembly which passes basketballs one-at-a-
> time in a controlled manner along a trajectory towards a waiting player.  The
> machine can be used with a collection net assembly adjacent a backboard so that
> basketballs from both made and missed shots are collected and directed into the
> basketball supply.  The supply of basketballs allows the passing machine to pass
> basketballs to the player as fast as desired, such as every three to four seconds.
> Balls can be passed from the machine on demand; the pass rate, the azimuth of
> the trajectory, the speed of the ball and the number of balls placed in play at each
> position can be preprogrammed.  Sensors are used to generate signals whenever a
> ball is placed in play and when a shot is made.  Shooting accuracy and associated
> information can be displayed for a player as well as recorded for future reference.

('018 Patent Abstract, Ex. A to Decl. of Stuart Nelson [Doc. No. 28-1.)

The terms that are presently in dispute occur in claims 22 and 32 of '018 Patent:

> 22.  A basketball passing machine and shot analysis system comprising:
> a basketball collection net assembly, positionable adjacent a
>    basketball backboard, comprising a frame and downwardly
>    converging netting supported by the frame, the collection
>    net assembly having a basketball discharge opening;
> the frame of the basketball collection net assembly being a floor-
>    supported frame, said floor-supported frame comprising:
>    a support frame comprising a vertical support with upper
>    and lower ends;
> a lift frame slidably mounted to the vertical support for movement
>    between an upper, use position and a lower, storage
>    position; and
> a netting frame assembly mounted to the lift frame, the netting
>    frame assembly comprising a netting frame and supporting
>    arms pivotably mounted to and extending from the netting
>    frame, said netting secured to the supporting arms;
>
> a basketball passing machine comprising:
> a body;
> a basketball supply, mounted to the body, comprising a basketball supply
>    region having an entrance , through which basketballs are

3

> introduced into the supply region from the basketball collection net assembly, the basketball supply region sized and configured to hold at least two basketballs; and
>
> a basketball ejector assembly, mounted to the body and operably coupled to the basketball supply, arranged and adapted to pass basketballs, one-at-a-time and in a controller manner, from the basketball supply along a trajectory.

('018 Patent, c. 14, ll: 17-49.)

> 32. The system according to claim 31, further comprising means for generating a ball-in-play signal.

(Id., c. 15, ll: 26-27.)

**A.** **"Basketball Passing Machine"**

The parties first dispute the meaning of the term "basketball passing machine" as it appears in claim 22 of the '018 Patent. Airborne asserts that the Court should construe "basketball passing machine" as a "machine for passing basketballs to players over a distance." (Joint Proposed Claim Construction Statement ("Joint Statement") at 8 [Doc. No. 22].) Shoot-A-Way, on the other hand, contends that the Court should construe the term as "separably positionable and independently useable ball delivery machine." (Id.)

In support of its construction, Airborne points to language in the claim which provides, "A basketball passing machine and shot analysis system comprising:" and "a basketball passing machine comprising . . . ." (Id.) (citing '018 Patent, c. 14, ll: 17-18; 37.) In addition, Airborne points to the specification of the '018 Patent, which states: "[t]he passing machine places balls in play by passing them to the player at virtually any chosen interval and over a range of distances." (Id.) (citing '018 Patent, c. 1, ll: 50-53.) Airborne asserts that the specification denotes that the "basketball passing machine" is simply a machine that passes (or throws) basketballs to a player over a distance.

4

Shoot-A-Way asserts that the term "basketball passing machine" should be construed as a "separably positionable and independently useable ball delivery machine." (Joint Statement at 8.) Shoot-A-Way claims that its construction is supported by intrinsic evidence found in the Summary of Invention:

> The basketball passing machine can be used alone anywhere on the basketball court to pass basketballs to one or more players. The basketball passing machine can also be used in conjunction with the basketball net assembly, which is positionable adjacent to a basketball backboard.

('018 Patent at c. 2, ll: 25-29.)   Shoot-A-Way contends that the Summary of Invention describes a machine that is not just "a generic ball passing apparatus," but is "an independently moveable and positionable ball delivery device." (Def.'s Opp'n Mem. at 26-27 [Doc. No. 24].)   In addition, Shoot-A-Way relies on Figures 2 and 9 of the patent in support of its construction.   In those figures, the machines include wheels and are positionable.   ('018 Patent at Figs. 2 and 9, Ex. A to Nelson Decl.)   Shoot-A-Way also points to Figure 12 of the '018 Patent, in which a free-standing net assembly is configured to "dock" the machine under the basket, if so desired. Also, in Figure 1, Shoot-A-Way notes that the machine is shown positioned under a collection net assembly mounted to a backboard.   To reflect the invention envisioned in the '018 Patent, Shoot-A-Way argues that the basketball passing machine must be construed as a detachable structure, that is, a separable, independently useable component.   Shoot-A-Way contends that Airborne's proposed construction of a "machine for passing basketballs to a player over a distance" fails to reflect the invention described.   Airborne, however, argues that Shoot-A-Way's proposed construction injects language not found in any part of the claim, nor in any dictionary definition of the terms "basketball," "passing," or "machine."

As noted, claim terms are given their "ordinary and customary meaning," which is "the

meaning that the term would have to a person of ordinary skill in the art in question at the time

of the invention." Phillips, 415 F.3d at 1312-13.  The phrases proposed by Defendant,

"separably positionable" and "independently useable," do not appear in the claims of the '018

Patent, nor do they appear in dictionary definitions of the terms at issue – "basketball,"

"passing," or "machine."  A construction may only differ from the ordinary meaning of terms

when the patentee offers an affirmative "special definition" to the terms and that definition is

"clearly enunciated" in either the written description or the prosecution history.  Minnesota

Mining & Mfg. Co. v. Fellowes Mfg. Co., 76 F. Supp.2d 972, 977 (D. Minn. 1999).

       While the specification shows embodiments where the basketball passing machine can be

separated from the collection net assembly, the Summary of Invention also provides

>       [t]he collection net assembly is <u>preferably</u> a stand alone structure or is constructed
>       to be hung from the backboard.  The basketball collection net assembly <u>could also</u>
>       <u>be</u> mounted to the passing machine and positioned adjacent to the backboard.

('018 Patent, c. 2, ll: 29-34) (emphasis added).   Claim 22 also repeatedly uses the word

"comprising," as in "a basketball passing machine comprising: a body; a basketball supply . . . ."

(Id. c. 14, ll: 37-39.)   Based on this language, the Court finds that the use of the machine in a

form separate from the collection net assembly is one of the disclosed embodiments, but it does

not redefine the claim language.   The claim discloses the core elements of the device, but is not

exclusive.  "[Al]though the specification often describes very specific embodiments of the

invention, we have repeatedly warned against confining the claims to those embodiments."

Phillips, 415 F.3d at 1323; see also Nazomi Communications, Inc. v. ARM Holdings, PLC, 403

F.3d 1364, 1369 (Fed. Cir. 2005) (noting that claims may embrace "different subject matter than

is illustrated in the specific embodiments in the specification")   "[A] patent claim is not

necessarily limited to a preferred embodiment disclosed in the patent." Transmatic, Inc. v. Gulton Indus., 53 F.3d 1270, 1277 (Fed. Cir. 1995).  Morever, even if a patent describes only a single embodiment, courts have rejected the notion that the claims of the patent "must be construed as being limited to that embodiment." Phillips, 415 F.3d at 1323.  Because the '018 Patent does not otherwise clearly enunciate a special definition for "basketball passing machine," and because Defendant's proposed terms "separably positionable" and "independently useable," do not appear in the claims of the '018 Patent, the Court finds that Airborne proposes the appropriate construction.  For all of these reasons, based on the intrinsic evidence of the Patent, the Court finds that "basketball passing machine" is properly construed as "machine for passing basketballs to a player over a distance."

### B.    "System"

The parties dispute the need for construction of the term "system" as it appears in the preamble of claim 22. Airborne contends that no construction is necessary, but alternatively that if the Court decides to construe the term, it should be construed as "a group of interacting components." (Joint Statement at 12.)  Shoot-A-Way, on the other hand, asserts that the Court should construe "system" as "separably positionable but functionally cooperative components." (Id.)

Airborne maintains that the use of "system" does not require construction because it is not a limitation of any claim asserted in this action and appears only in the preamble of the claims of the '018 Patent.  ('018 Patent, claims 22-39.)  The preamble of claim 22 provides for "a basketball passing machine and shot analysis system," and the preambles to dependent claims 28, 31-37 read, "[t]he system according to claim []."  Airborne argues that the preamble is not

necessary to give meaning to the claims because the body of each claim sets out the claimed invention without reference to the preambles.

If, however, the Court construes the term "system," Airborne contends that it should be construed to have its ordinary meaning of "a group of interacting components." This construction, Airborne contends, is consistent with how the term is used in the various claim preambles. In its alternative argument, Airborne suggests a construction of "system" as "a group of interacting components," gleaned from editions of the American Heritage Dictionary of the English Language. Airborne asserts that Shoot-A-Way's proposed construction of "separably positionable but functionally cooperative elements" is found nowhere in a definition of "system."

Shoot-A-Way asserts, however, that the term "system" in the preamble of claim 22 acts as a limitation and requires construction. Shoot-A-Way contends that because the body of claim 22 does not define a "system" or how "shot analysis" is to be accomplished, the preamble "breathes life and meaning into the claim" and serves as a limitation to the claim. (Def.'s Opp'n Mem. at 17.)

"'[I]f the body of the claim sets out the complete invention, and the preamble is not necessary to give 'life, meaning and vitality' to the claim, 'then the preamble is of no significance to claim construction because it cannot be said to constitute or explain a claim limitation.'" Schumer v. Lab. Computer Sys., Inc., 308 F.3d 1304, 1310 (Fed. Cir. 2002) (quoting Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc., 246 F.3d 1368, 1373-74 (Fed. Cir. 2001) (internal citation omitted)). In Kropa v. Robie, 187 F.2d 150 (C.C.P.A. 1951), the court provided examples of cases in which language in the preamble of a patent was not a limitation to each claim. These cases involved situations

8

where the portion of the claim following the preamble was a self-contained description of the structure not depending for completeness upon the introductory clause; or where the claim or count was drawn to a product and the introductory clause merely recited a property inherent in the old composition defined by the remaining part of the claim.

Id. at 152.

The Court finds that the use of the word "system" in the preamble is not necessary to give life, vitality and meaning to the claim.  Apart from the preamble, the body of claim 22 on its own defines a complete and functional structure.  See Kropa, 187 F.2d at 152 (finding that the preamble is not a limitation where the claim language apart from the preamble properly defines the invention); see also Arshal v. United States, 621 F.2d 421, 430–31 (Cl. Ct. 1980) (holding that when the preamble merely states the intended purpose of the claimed invention, a compelling reason must exist to treat it as a claim limitation). Use of the term "system" is not necessary to complete the structure.  However, the term does help explain that the structure is comprised of components.  In other words, the term "system" puts claim 22 into context, providing purpose and meaning for the claimed structure.  Accordingly, the court finds that rather than being a claim limitation, the term "system" is merely a statement that the structure has more than one component.  Moreover, "system" is a commonly understood word (which, as Airborne suggests, means "a group of interacting components").  For these reasons, the Court finds that the term "system" is not a limitation of any claim in this action.  Shoot-A-Way's proposed construction, "separably positionable but functionally cooperative components," would import a limitation that is not found in the claim (i.e., "separably positionable") and would appear to ignore the phrase "shot analysis" in the preamble.  The Court agrees with Plaintiff that "shot analysis" has nothing to do with being "separably positionable."   The Court thus concludes that the term "system," as it appears on the context of the preamble of claim 22, has a

9

meaning that is readily understandable and construction is not necessary.

### C.  "Basketball Passing Machine and Shot Analysis System"

The parties also dispute the meaning of the phrase "basketball passing machine and shot analysis system" as it appears in the preamble of claim 22.  Again, as with the term "system," Airborne contends that no construction is necessary, but if the Court construes the phrase, Airborne alternatively asserts that it should be construed as "a group of interacting components for passing basketballs to a player over a distance and analyzing shots by that player."  (Joint Statement at 13.)  Shoot-A-Way, however, contends that the proper construction is "a basketball passing machine and a basketball collection apparatus that are separably positionable but functionally cooperative."  (Id.)  In addition, Shoot-A-Way contends that the preamble of claim 22 should be construed as a claim limitation.

Airborne makes arguments similar to those that it advanced regarding whether the term "system" required construction.  It argues that the term "basketball passing machine and shot analysis system" do not require construction, because the term is not a limitation of any claim asserted in the action.  If, however, the Court decides to construe the term, Airborne advocates breaking the phrase down into its discrete parts: "basketball passing machine," "shot analysis," and "system," construing the phrase as "a group of interacting components for passing basketballs to a player over a distance and analyzing shots by that player."  (Joint Statement at 13.)

As with its discussion of "system," the Court finds that "basketball passing machine and shot analysis system" is not a claim limitation.  Defendant claims that the preamble should be construed as a limitation on the Patent's claims because it does not merely state a general purpose or the intended use but instead explains how the invention will be implemented.

10

However, even assuming, without deciding, that the Patent's preamble does more than state a general purpose or the intended use, such fact by itself would not be sufficient to mandate that the preamble be construed as a claim limitation.   If the claims themselves fully set forth the invention and the preamble offers no distinct definition of any of the invention's limitations, then the preamble is of no significance to claim construction.  See Pitney Bowes, Inc. v. Hewlett–Packard Co., 182 F.3d 1298, 1305 (Fed. Cir. 1999).   In this case, the claims of the Patent fully recite the claimed invention without resorting to the preamble, and the preamble does not offer a distinct definition of any of the invention's limitations. The phrase "basketball passing machine and shot analysis system" does not specify a limitation on the Patent. Moreover, Shoot-A-Way's proposed construction again imports a "separably positionable" limitation into the claim construction.  Understanding of the phrase "basketball passing machine and shot analysis system" is also not dependent upon it being separably positionable.   The Court finds that no construction is necessary for this phrase as it appears in the context of the preamble of claim 22.

###     D.     "Basketball Collection Net Assembly"

The parties also dispute the meaning of the term "basketball collection net assembly" as it appears in claim 22.  Airborne contends that it should be construed as "netting and a frame sufficient to support the netting."  (Joint Statement at 16.)  In support of its position, Airborne points to the language of claim 22, as well as to the specification.  Shoot-A-Way, however, argues that the court should construe the phrase as "the components of a basketball retrieval device that provide for capture of a basketball shot in the vicinity of a basketball hoop and release of the captured ball for reuse when positioned as required by the claim element adjacent a backboard."  (Id.)

Claim 22 provides:

> a basketball collection net assembly, positionable adjacent a basketball
> backboard, comprising a frame and downwardly converging netting supported by
> the frame, the collection net assembly having a basketball discharge opening[.]

('018 Patent, c. 14, ll: 19-23.)

The specification provides for a "freestanding collecting net frame 32a and netting 34a." (Id., c. 10, ll: 17-18.)  Airborne acknowledges additional aspects of "basketball net assembly" in claim 22 such as "positionable adjacent a basketball backboard," "having a basketball discharge opening, " and "basketballs are introduced into the supply region from the basketball collection net assembly."  However, Airborne contends that the inclusion of such limitations as part of the construction of this term would be unhelpful and duplicative, since those limitations are separately included as part of the language of claim 22.

The Court agrees with Plaintiff's proposed construction.  The possible additional aspects of "basketball net assembly," identified above by Airborne, are not necessary to the construction of "basketball net assembly."  The Court declines to adopt Defendant's proposed construction because its "basketball collection net assembly" construction requires "release of the captured ball," which is not found in the claims.  The claims, specification and figures do not include "release of the captured ball" as a function of any embodiment of the "basketball collection net assembly."  Rather, the release function may be accomplished by paddle wheels, in combination with other components.  (Id., c. 5, ll: 57- c. 6, ll: 2.)  The paddle wheel is not required by claim 22, nor is it involved in this litigation.

In addition, Shoot-A-Way's proposed construction states that the "basketball collection net assembly" is required to be "positioned as required by the claim element adjacent a

backboard." (Joint Statement at 16.) Claim 22, however, requires that the basketball collection net assembly be "positionable," not "positioned." As Plaintiff points out, Defendant's construction could be interpreted such that no system is infringing unless it is actually positioned adjacent a backboard. Such a construction of "basketball collection net assembly" is not supported by the evidence. The Court therefore concludes that the term "basketball collection net assembly" is properly construed as "netting and a frame sufficient to support the netting."

E.      "Frame"

The parties dispute the meaning of the term "frame" as it appears in claim 22. Airborne proposes "support structure" and Shoot-A-Way proposes "a support structure of the basketball collection net assembly described in the claim." (Id. at 19.) The term "frame" appears throughout claim 22 : "a frame of the basketball collection net assembly," a "floor-supported frame," "a support frame," "a lift frame," and "a netting frame." ('018 Patent, Cl. 22.) Each of the uses of "frame" is most concisely construed as a "support structure." The Court therefore concludes that the term "frame" shall be construed as a "support structure."

F.      "Downwardly Converging Netting"

Airborne asserts that the phrase "downwardly converging netting" should be construed as "netting suspended from the supporting arms so that netting forms a basketball collection net with a funnel-like shape with a top opening that is larger than the opening at the bottom of the net." (Joint Statement at 22.) Shoot-A-Way, on the other hand, proposes that the Court construe the phrase as "basketball collection netting attached to the supporting arms of the basketball collection net assembly." (Id.)

Airborne contends that the term "netting" requires no explanation, and therefore focuses its construction on "downwardly converging." It points to language in the Patent Figures and

13

portions of the specification in support of its proposed construction:

> The collection net includes a frame and downwardly converging netting
> suspended from the frame.  Basketballs from both made and missed shots are
> collected by the collection net and are directed through a discharge opening at the
> bottom of the collection net to the entrance of the basketball supply of the passing
> machine.

('018 Patent, c. 2, ll: 36-41.)

> Collection net assembly 16, see FIGS. 1, 3, and 4, includes a funnel-like
> collection net frame 32 which supports netting 34.

(Id., c. 5, ll: 1-3; see also c. 2, ll: 12-14.)

In support of their respective constructions, both parties point to the following language

in the specification:

> Netting 34a is attached to arms 42a and extends from the upper distal ends of
> arms 42a downwardly to a U-shaped net keeper 273.

(Id. c. 11, ll: 24-26.)

The Court finds that Plaintiff's proposed construction, which includes the "funnel-like"

terminology and uses the verb "suspended," as opposed to "attached," is consistent with the

specification and the figures, which depict the funnel-shaped netting and which reveal that the

"supporting arms" give shape to the netting.  The term "downwardly converging netting" shall

therefore be construed as "netting suspended from the supporting arms so that netting forms a

basketball collection net with a funnel-like shape with a top opening that is larger than the

opening at the bottom of the net."

### G.    "Basketball Discharge Opening"

The parties dispute the meaning of the term "basketball discharge opening," which

appears in claims 22, 28 and 40 of the '018 Patent.  Both claims 22 and 40 refer to "the

collection net assembly having a basketball discharge opening."  (Id., c. 14, ll: 21-23; c. 16, ll:

14

23-24.)  Airborne asserts that the term "basketball discharge opening" should be construed as

"outlet at bottom of downwardly converging netting," and Shoot-A-Way asserts that the term

should be construed as "an opening at the lower end of the basketball collection netting assembly

frame."  (Joint Statement at 24.)

Airborne argues that claims 22, 28 and 40 are most closely related to the embodiment of

Figures 8 and 12, which provides for a collection net frame that includes a support frame, which

is positioned adjacent to the floor.  Airborne argues that Defendant's proposed construction of

"basketball discharge opening" requires it to be positioned "at the lower end of the basketball

collection netting assembly frame," leading to an "absurd result" of the "basketball discharge

opening" being positioned adjacent to the floor.  (Pl's Mem. at 27.)   Shoot-A-Way counters that

the only place in which the '018 patent specification provides for the bottom of the netting to be

positioned is at the lower end of the netting frame assembly, which Shoot-A-Way's proposed

construction addresses.  (Def.'s Opp'n Mem. at 25.)

The patent specification provides for an opening of the netting:

The collection net includes a frame and downwardly converging netting
suspended from the frame.  Basketballs from both made and missed shots are
collected by the collection net and are directed <u>through a discharge opening at the
bottom of the collection net</u> to the entrance of the basketball supply of the passing
machine.

('018 Patent, c. 2, ll: 36-41) (emphasis added).  In addition, the illustration and accompanying

language for Figure 1 refer to the "discharge opening of the collection net."  (<u>Id.</u>, c. 3, ll: 59-63;

<u>see</u> <u>also</u> c. 7, ll: 9-12.)  The Court therefore finds that Plaintiff's proposed construction is best

supported by the claim language and patent specification.  The Court concludes that "basketball

discharge opening" is properly construed as  "outlet at bottom of downwardly converging

netting."

### H.   "Support Frame"

Claim 22 provides "the frame of the basketball collection net assembly being a floor-supported frame, said floor-supported frame comprising: a support frame comprising a vertical support with upper and lower ends." ('018 Patent, c. 14, ll: 24-28.)  Figures 12 and 13 show a support frame (213) with vertical supports (216), and a lift frame slidably mounted on the vertical supports (216).  (Id., c. 10, ll: 23-41.)   Plaintiff proposes that "support frame" be construed as "a support structure with a vertical support upon which a lift frame is slidably mounted."  Defendant contends that the terms should be construed as "a support structure (of the floor-supported frame) having a floor-supported base and the described vertical support of this claim element."  (Joint Statement at 26.)

Airborne contends that Shoot-A-Way's proposed construction inappropriately imports a limitation, i.e., floor-supported base, into the claim.  Airborne contends that while the illustrated embodiment shows a support frame to include a base (222), lockable caster wheels (31a), footplate (224) and bar (226), none of these features are necessarily required by the phrase "support frame," nor any phrase in claim 22.

The Court agrees that the claims do not require a "floor-supported base " and declines to read that limitation into the claim.[1]  The patent specifications provide for a support frame having a pair of vertical supports for movement.  (See '018 Patent, c. 10, ll: 23-38.)  The Court finds that Plaintiff's proposed construction best reflects "support frame" and therefore construes "support frame" as "a support structure with a vertical support upon which a lift frame is slidably

---

[1]  The phrase "floor-supported frame," however, appears in claims 22 and 40 and the parties have agreed to its construction as "a support structure positioned on the floor." (Joint Statement at 2.)

mounted."

### I.  "A Support Frame Comprising a Vertical Support With Upper and Lower Ends"

Having construed "a support frame," the Court therefore analyzes the parties' competing proposed constructions of the phrase "a support frame comprising a vertical support with upper and lower ends" by focusing on "comprising a vertical support with upper and lower ends." Airborne argues that the term should be construed as "a support structure with an elongated vertically aligned portion with upper and lower ends upon which a lift frame is slidably mounted," whereas Shoot-A-Way proposes that the term should be construed as "a support structure (of the floor-supported frame) having a floor-supported base with upwardly (vertically) orientated support members secured to the base at one (lower) end and extending away from the base to the other (upper) end."  (Joint Statement at 28.)

Airborne points to Figures 12 and 13 and to the patent specifications, which state that "[t]he base ends of vertical supports 216 are coupled by a footplate 224 positioned adjacent to the floor."  ('018 Patent, c. 10, ll: 32-33, Fig. 12.)  In addition, Airborne notes that the specification states that "[t]he upper ends of vertical supports 216 are coupled together by a bar 226 from which a hook support bracket 228 depends." (Id., c. 10, ll: 39-41.)  Thus, Airborne argues that each vertical support is simply an elongated, vertically aligned portion of the support structure with upper and lower ends.   However, Shoot-A-Way argues that the intrinsic evidence demonstrates that the support frame from which the vertical support of the claim extends has a floor-supported base component.  Shoot-A-Way contends that, because the figures and written description of the '018 Patent do not disclose a support frame other than one in which the vertically oriented members are secured at their lower ends to the floor-supported base, the

17

"floor-supported base" language is necessary for construction of this claim.

The '018 Patent shows a "pair of vertical supports 216" upon which the lift frame (218) is mounted.  (Id., c. 10, ll: 23-41.)  While the upper and lower ends of the vertical supports (216) are not numbered, the specification notes that the base, or bottom, ends of the vertical supports are coupled by a footplate positioned adjacent to the floor, while the upper ends of the vertical supports are coupled by a bar (226) "from which a hook depends."  (Id.,  c. 10, ll: 32-33; 39-41; Figs. 12 & 13.)  The Court agrees with Plaintiff's proposed construction that each vertical support is an elongated, vertically aligned portion with upper and lower ends.  Defendant's proposed construction that a vertical support be "secured to the base at one (lower) end" is not required by the claim language and appears to conflict with the illustrated embodiments, in which the lower ends of the vertical supports (216) appear to extend past the base (222).  In addition, Shoot-A-Way's proposed construction requires multiple "support members," whereas the specification refers to a "pair of" vertical supports and the claims only require "a vertical support."  The Court therefore construes "a support frame comprising a vertical support with upper and lower ends" as "a support structure with an elongated vertically aligned portion with upper and lower ends upon which a lift frame is slidably mounted."

### J.    "Lift Frame Slidably Mounted to the Vertical Support"

The parties dispute the meaning of the phrase "lift frame slidably mounted to the vertical support," which appears in claims 22 and 40 of the '018 Patent.  Airborne asserts that the Court should construe the term to mean "a support structure which is connected to the vertical support to allow the lift frame to slide up and down on the vertical support."  (Joint Statement at 30.) Defendant contends that the term should be construed as "a support structure slidably mounted to the vertical support members of the support frame base that carries a netting frame assembly

of the basketball retrieval device."  (Id.)

Defendant argues that Plaintiff construes "lift frame" as a mere "support structure" and rewords the claim phrase contrary to its express language, i.e., that the lift frame in claims 22 and 40 is said to be "slidably mounted to the vertical support." In addition, Shoot-A-Way contends that Airborne inappropriately substitutes "connected to" for "slidably mounted." Shoot-A-Way further contends that Airborne also includes the following ambiguous language: "to allow the lift frame to slide up and down on a vertical support."  Shoot-A-Way asserts that there is no basis for changing the clear language of "slidably mounted" to the more vague term "connected to."  Morever, Shoot-A-Way contends that Plaintiff's proposed construction fails to acknowledge the intrinsic evidence as to the proper construction of "lift frame" in claims 22 and 40.

The applicable language in claim 22 provides:

> a lift frame slidably mounted to the vertical support for movement between an upper, use position and a lower, storage position; and a netting frame assembly mounted to the lift frame, the netting frame assembly comprising a netting frame and supporting arms pivotably mounted to and extending from the netting frame, said netting secured to the supporting arms. . . .

('018 Patent, c. 14, ll: 29-36.)

The applicable language in claim 40 similarly provides:

> a lift frame slidably mounted to the vertical support for movement between an upper, use position and a lower, storage position; and a netting frame assembly mounted to the lift frame, the netting frame assembly comprising a netting frame and supporting arms pivotably mounted to and extending from the netting frame, said downwardly-converging netting secured to the supporting arms.

(Id., c. 16, ll: 14-21.)

The specification states:

> The stand-alone collection net assembly preferably includes at least a support frame, which rests on the floor, a lift frame, which moves between a lowered, storage position and raised, use position, and a collection net assembly mounted to and carried by the lift frame.

(Id., c. 2, ll: 52-56.)

The specification further provides, "Lift frame 218 includes a support guide assembly 240 having low friction guides 242 which ride along vertical supports 216 of support frame 214 as lift frame 218 moves between the lowered and raised positions."  (Id., c. 10, ll: 51-54.)

The Court agrees that Airborne's proposed construction fails to incorporate the express language – "slidably mounted" – and instead proposes the more generic and vague phrase "connected to."  Aside from that phrase, however, Airborne's construction is otherwise consistent with the language of the claims and the specifications.  Shoot-A-Way's proposed construction uses the "slidably mounted" language from the claim.  However, its proposed construction also utilizes plural language, such as "vertical support members," when the claim only requires a single support.  In addition, Shoot-A-Way's construction requires that the vertical supports be secured to a base, which is not required by the claims.  Accordingly, the Court concludes that certain proposed language from both parties may be combined together to provide a proper construction.   The term "lift frame slidably mounted to the vertical support," is therefore construed as "a support structure which is slidably mounted to the vertical support to allow the lift frame to slide up and down on the vertical support."

### K.    "For Movement Between"

The parties also dispute the meaning of the term "for movement between" which appears in claims 22 and 40 of the '018 Patent.  Airborne asserts that the term should be construed as

"capable of moving from one position to another position, " while Shoot-A-Way argues that the

term should be construed as "capability for an uninterrupted movement from one defined

position to another defined position to another defined position." (Joint Statement at 32.)

The language in claims 22 and 40  provides for "a lift frame slidably mounted to the

vertical support for movement between an upper, use position and a lower, storage position."

('018 Patent, c. 14, ll: 29-31; c. 16, ll: 15-17.)  The specification states:

> Collection net frame 32a includes a support frame 214, having a pair of vertical
> supports 216, a lift frame 218 mounted to vertical supports 216 for movement
> between a raised or use position of FIG. 12 and a lowered or stored position of
> FIG. 13, and a netting frame assembly 220 removably mounted to lift frame 218.

(Id., c. 10, ll: 23-29.)

The summary of invention states:

> The stand-alone collection net assembly preferably includes at least a support
> frame, which rests on the floor, a lift frame, which moves between a lowered,
> storage position and a raised, use position, and a collection net assembly mounted
> to and carried by the lift frame.

(Id., c. 2, ll: 52-56.)

Defendant's construction includes the term "uninterrupted" to describe the movement.

Shoot-A-Way argues that Figures 12 and 13 disclose the structure of the claimed lift frame as

designed and disclosed to be capable of direct, uninterrupted movement between the upper and

lower positions.  (Joint Statement at 33.)  While Shoot-A-Way's proposed construction of

"capability for an uninterrupted movement from one defined position to another defined

position" is arguably shown in a preferred embodiment (to the extent that it is "capable of

uninterrupted movement), the claim is not confined to that embodiment.  See Phillips, 415 F.3d

at 1323; Transmatic, 53 F.3d at 1277.  Airborne's proposed construction is consistent with the

claim language and patent specification.  The Court therefore construes "for movement between"

as "capable of moving from one position to another position."

**L.     "Upper, Use Position"**

Airborne proposes that the term "upper, use position" be construed as "position to which the lift frame is raised to locate the net at a height for collecting basketballs." (Joint Statement at 34.) On the other hand, Shoot-A-Way asserts that the term should be construed as "raised position of the lift frame abutting the backboard to place the netting frame assembly for ball collection." (Id.)

In support of its construction, Airborne cites to the specification language referencing the "raised or use position" of Figure 12. ('018 Patent, c. 10, ll: 23-33.) Shoot-A-Way, however, argues that this specification supports its proposed construction. Plaintiff contends that none of the claims of the '018 Patent require the "upper use position" to reflect the lift frame abutting the backboard.

Shoot-A-Way's proposed construction, using the phrase "abutting the backboard," does not find support in the claim language. However, the '018 Patent describes an embodiment with "main support bar 254 abutting backboard 6." ('018 Patent, c. 11, ll: 55-56.) None of the claims at issue here, however, appear to require that there be a main support bar or backboard, let alone one that is abutting as opposed to adjacent to the backboard. The Court therefore construes "upper, use position" as "position to which the lift frame is raised to locate the net at a height for collecting basketballs."

**M.     "Lower, Storage Position"**

"Lower, storage position" is another term about which the parties disagree. Plaintiff contends that it should be construed as "position to which the lift frame is lowered to accommodate storage." Defendant asserts that it should be construed as "lowered position of the

lift frame to permit storage."  (Joint Statement at 37.)

The patent specification provides:

The stand-alone collection net assembly preferably includes at least a support frame, which rests on the floor, a lift frame, which moves between a lowered, storage position and a raised, use position, and a collection net assembly mounted to and carried by a lift frame.

('018 Patent, c. 2, ll: 52-56.)

Plaintiff asserts that Defendant's construction, using the word "permit," as opposed to Plaintiff's proposed "accommodate," is misleading, because when the lift frame is in the lowered, storage position, it helps accommodate storage, but it is not strictly necessary to permit storage.  The Court concludes that "lower, storage position" shall be construed as "position to which the lift frame is lowered to accommodate storage."

**N.     "Netting Frame Assembly"**

The parties dispute the meaning of the term "netting frame assembly," which appears in claims 22 and 40.  In claim 22, the term appears as "a netting frame assembly mounted to the lift frame, the netting frame assembly comprising a netting frame and supporting arms pivotably mounted to and extending from the netting frame, said netting secured to the supporting arms." ('018 Patent, c. 14, ll: 32-36.)  The term is used in nearly the same language in claim 40.  (Id., c. 16, ll: 17-21.)  Airborne contends that it should be construed as "a netting frame and a set of pivotably connected supporting arms that support the net to have a funnel-like shape when all supporting arms are pivoted outward."  (Joint Statement at 39.)  Shoot-A-Way asserts that this claim requires no construction; alternatively, it proposes that it be construed as "a removably mountable collection of components that makes up the netting support structure that defines the ball capture area."  (Id.)

The Court notes that the parties agree that the term "netting frame" means "the support structure of the netting frame assembly to which the supporting arms for the netting material are pivotably mounted." (Joint Statement at 3.)  The netting frame assembly frames the net, supporting it in a funnel-like shape when the supporting arms pivot outwards, as in Figure 8 in the '018 Patent.  In contrast, in Figure 14, the supporting arms are pivoted inward and upright for storage. ('018 Patent, c. 11, ll:  9-26.)  The Court finds that construction of "netting frame assembly" is necessary, particularly as the term is included in the agreed-upon term "netting frame," and one skilled in the art would not necessarily understand to what the added term "assembly" refers.

The specification uses the term "removably mounted" in one preferred embodiment (id., c. 2, ll: 56-62), but the netting frame assembly is only required to be removably mounted in claims 24 and 41 – not claim 22.  "It is improper for courts to read into an independent claim a limitation explicitly set forth in another claim."  Environmental Designs, Ltd. v. Union Oil Co. of California, 713 F.2d 693, 699 (Fed. Cir. 1984).  The applicant certainly was aware of the phrase "removably mounted," and would have presumably used that phrase in claim 22 had he intended to do so.  The Court will not add a limitation that the applicant elected not to utilize in claim 22.  The claim language, however, does refer to the pivotably mounted supporting arms ('018 Patent, c. 14, ll: 32-36) and the specification includes the "funnel-like collection net frame 32 which supports netting 34." (Id. c. 5, ll: 1-3.)  Accordingly, the Court construes "netting frame assembly" as "a netting frame and a set of pivotally connected supporting arms that support the net to have a funnel-like shape when all supporting arms are pivoted outward."

**O.     "Netting Frame Assembly Mounted to a Lift Frame"**

The parties disagree about the construction of "netting frame assembly mounted to a lift frame."  Airborne contends that this term, found in claims 22 and 40, should be construed as "the netting frame mounts to the lift frame so that the netting frame and supporting arms move up and down with the lift frame."  (Joint Statement at 42.)  Shoot-A-Way, on the other hand, contends that this term should be construed as "a removably mountable collection of components carried on the lift frame that makes up the netting support structure that defines the ball capture area.."  (Id.)

Because the Court has already construed the phrase "netting frame assembly" herein, it focuses on the construction of the phrase "mounted to a lift frame."  The language of claim 22 requires that the netting frame assembly be "mounted" to the lift frame, rather than "removably mounted."  Claim 22 provides: "a netting frame assembly mounted to the lift frame, the netting frame assembly comprising a netting frame and supporting arms pivotably mounted to and extending from the netting frame, said netting secured to the supporting arms." ('018 Patent, c. 14, ll: 32-36.)   It is true, however, that claims 24 and 41 refer to the "removably mounted" netting frame assembly.  Defendant argues that the term "removably" is necessary to the construction of "netting frame assembly mounted to a lift frame."  In support of its position, Shoot-A-Way points to the summary of invention of the Patent, which provides: "The netting frame is mountable to and dismountible from the lift frame to permit the collection net assembly to be separated from the lift frame to accommodate movement and storage."  (Id., c. 2, ll: 59-62.)  In addition, in the specification, the Patent provides, "To keep arms 421 from pivoting outwardly during mounting, dismounting, moving and storage appropriate tethers, fasteners or elastic cords can be used to maintain the arms in their generally upright positions of FIG. 14."  (Id., c. 11, ll: 20-24.)

25

The "removable" quality of the netting frame assembly is not required by the claims asserted in this dispute, but rather, as Plaintiff contends, is merely an optional feature of the netting frame assembly required by two dependent claims – claims 24 and 41.  As noted previously, it is not proper for courts to read into an independent claim a limitation explicitly set forth in another claim.  <u>Environmental Designs</u>, 713 F.2d at 699.  While Shoot-A-Way argues that the netting frame assembly must be removably mounted or it would be impossible for the device to have a lower, storage position, Figures 15 and 16 show the lift frame (218) and the netting frame assembly (220) mounted together and in the lower storage position.  For these reasons, the Court construes "netting frame assembly mounted to lift frame" as "the netting frame mounts to the lift frame so that the netting frame and supporting arms move up and down with the lift frame."

P.      **"Supporting Arms"**

The parties dispute the meaning of the term "supporting arms" as it appears in claims 22 and 40.  Airborne asserts that the term should be construed as "arms that pivot outward from the netting frame to support the netting in a funnel-like shape and pivot inward to collapse the netting."  (Joint Statement at 45.)  Shoot-A-Way, however argues that the term should be construed as "arms that pivot outwardly from the netting frame."  (<u>Id.</u>)

The applicable claim language in claim 22 provides: "a netting frame assembly mounted to the lift frame, the netting frame assembly comprising a netting frame and supporting arms pivotably mounted to and extending from the netting frame, said netting secured to the supporting arms."  ('018 Patent, c. 14, ll: 32-36.)   Plaintiff argues that its proposed construction, which refers to both the funnel-like shape of the netting and the inward pivot by which the arms collapse is appropriate, citing to Figure 8, which depicts the outwardly pivoting supporting arms,

26

and Figure 15, which depicts the collapsed, no longer funnel-shaped netting.

The Court concludes that construction of the term "supporting arms" shall include language recognizing that the arms pivot inwardly and that they also support the downwardly converging netting, as such a construction best reflects the use of the term in claims 22 and 40. Accordingly, the Court concludes that "supporting arms" shall be construed as "arms that pivot outward from the netting frame to support the netting in a funnel-like shape and pivot inward to collapse the netting."

**Q.**     **"Body"**

The parties also dispute construction of the term "body" as it appears in claim 22. Airborne proposes that "body" be construed as "a structure to which the basketball supply and the basketball ejector assembly of the basketball passing machine are mounted."  (Joint Statement at 48.)  Shoot-A-Way proposes the following construction: "a support structure for the separably positionable basketball passing machine." (Id.)

The term is used  in claim 22 as follows:

> a basketball passing machine comprising:
> > a body;
> > a basketball supply, mounted to the body, comprising a basketball supply region having an entrance , through which basketballs are introduced into the supply region from the basketball collection net assembly, the basketball supply region sized and configured to hold at least two basketballs; and
> > a basketball ejector assembly, mounted to the body and operably coupled to the basketball supply, arranged and adapted to pass basketballs, one-at-a-time and in a controller manner, from the basketball supply along a trajectory.

('018 Patent c. 14, ll: 17-49.)   The specification also includes the term "body," using it in a similar way, e.g., "the basketball passing machine includes a body to which a basketball supply and a basketball ejector assembly are mounted."  (Id. c. 2, ll: 15-17; see also, c. 4, ll: 63-67; c. 9,

ll: 42-50.)

As explained above herein, claim 22 does not require the basketball passing machine to be "separately positionable."  Moreover, the use of the term "body" does not mean "separately positionable."  The construction suggested by Defendant is not supported by the intrinsic evidence, and adds limitations that are not warranted.  Thus, "body" should be construed as: "a structure to which the basketball supply and the basketball ejector assembly of the basketball passing machine are mounted."

R.      **"Means for Generating a Ball-in-Play Signal"**

The parties agree that the phrase "means for generating a ball-in-play signal" in claim 32 implicates the means-plus-function analysis of 35 U.S.C. § 112, ¶ 6. A means-plus-function analysis under 35 U.S.C. § 112, ¶ 6 is a two-step process: (1) first the Court construes the function recited, and (2) then determines what structures have been disclosed in the specification that correspond to the means for performing the identified function. Kemco Sales, Inc. v. Control Papers, Co., 208 F.3d 1352, 1361 (Fed. Cir. 2000).

1.      **Function**

The parties disagree on the construction of the function recited in claim 32.  Airborne proposes the construction "the function performed by this element is generating of signals that indicate ejection of a basketball."  (Joint Statement at 48.)  Shoot-A-Way, on the other hand, proposes the construction "the function performed by the element is generating of signals that indicate that a basketball is in play." (Id.)  Both constructions of the function are based on the claim language itself, which provides: "The system according to claim 31, further comprising means for generating a ball-in-play signal."  ('018 Patent, c. 15, ll: 26-27.)  The patent specification also addresses the signals as well, and includes language regarding ejection of the

ball, stating:

> An infrared ball-in-play sensor 74 is mounted on plates 72 (a receiver and transmitter on one plate 72 and a reflector on the other plate 72) and is used to provide a ball-in-play signal each time a basketball 48 is placed into play by being ejected along trajectory 70 from ejector assembly 26.

(Id. at c. 6, ll: 35-39.)  The parties' proposed constructions of function are substantially similar. The Court therefore adopts a combination of the proposals, construing the function recited in claim 32 as "the function performed by this element is generating of signals that indicate that a basketball is in play by ejection."

### 2. Corresponding Structure

Having construed the function recited in the claim, the Court must now determine what structures in the specification correspond to that function.  A patent that does not identify a corresponding structure is invalid as indefinite.  Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc., 296 F.3d 1106, 1113 (Fed. Cir. 2002). "In order to qualify as corresponding, the structure must not only perform the claimed function, but the specification must clearly associate the structure with performance of the function." Id. (citations omitted).  Further, only those features necessary to perform the claimed function constitute the corresponding structure.  Northrop Grumman Corp. v. Intel Corp., 325 F.3d 1346, 1352 (Fed. Cir. 2003).

The parties disagree about the construction of the structures disclosed for performing the function found in claim 32.  Airborne proposes the following construction: "a sensor using one or more infrared beams, an ultrasonic sensor, a physical contact sensor, a capacitance sensor, and a basketball pusher."  (Joint Statement at 50.)  Shoot-A-Way, however, offers a more abbreviated construction: "a sensor using one or more infrared beams."  (Id.)

In addition to the specification language quoted above, the specification also states:

> a ball-in-play sensor is preferably used to generate an appropriate signal when a
> ball is placed in play, that is passed to a player.  Information from the ball-in-play
> sensor and the shot-made sensor can be displayed for a player as well as printed
> and/or electronically recorded for future reference.

('018 Patent, c. 3, ll: 7-12.)

The following language is also found in the specification:

> The number of balls in play is determined by ball-in-play signals from sensor 74.
> The number of shots made is determined by a shot-made signal produced by a
> shot-made sensor 103 positions adjacent basket 9.  In the preferred embodiment,
> sensor 104 senses the presence of a ball 48 passing through hoop 10 and net 14 by
> sensing downward movement of net 14.  Other types of sensors, such as sensors
> using one or more infrared beams, ultrasonic senors, physical contacts,
> capacitance sensors, etc., could also be used.  Sensor 104 is preferably hardwired
> to controller 82, but could be made to be remotely coupled to controller 82 as
> well.

(Id., c. 7, ll: 18-29.)

Defendant argues that Plaintiff's proposed construction of the structure, referring to a

number of other kinds of sensors, is too broad and includes possible substitutions for the

preferred embodiment for a shot-made sensor, not a ball-in-play sensor.  In response, Plaintiff

argues that the identification of corresponding structure may embrace more than one preferred

embodiment.

It is true that "[w]hen multiple embodiments in the specification correspond to the

claimed function, proper application of § 112, ¶ 6 generally reads the claim element to embrace

each of those embodiments." Micro Chemical v. Great Plains Chem. Co., Inc., 194 F.3d 1250,

1258 (Fed. Cir. 1999).   However, "structure disclosed in the specification is 'corresponding'

structure 'only if the specification or the prosecution history clearly links or associates that

structure to the function recited in the claim.'" Northrop Grumman., 325 F.3d at 1352 (quoting

B. Braun Med., Inc. v. Abbott Labs., 124 F.3d 1419, 1424 (Fed. Cir. 1997)).   "A court may not

import into the claim features that are unnecessary to perform the claimed function." Id. (citing

Acromed Corp. v. Sofamor Danek Group, Inc., 253 F.3d 1371, 1382 (Fed. Cir. 2001).   If certain

features do not perform the recited function, they do not constitute corresponding structure and

do not serve as claim limitations. Id. (citations omitted).   The Court has determined that the

function of claim 32 is "generating of signals that indicate that a basketball is in play by

ejection."  Therefore, the focus is appropriately on the structure for disclosing the generation of a

ball-in-play signal, rather than a shot-made signal.

The specification language in which the alternative types of sensors are mentioned does

not clearly refer to the shot-made sensor or the ball-in-play sensor.  The language regarding

alternative sensors or means of generating a signal follows a reference to the shot-made sensor

(104), stating, "[o]ther types of sensors, such as sensors . . . could also be used."  ('018 Patent, c.

7, ll: 24-27.)   However, the embodiment of basketball passing machine 18a, shown in Figures

8-11, generates a ball-in-play signal through the use of a "pusher," as opposed to an infrared

signal. The corresponding specification language provides: "Generation of ball-in-play signal

occurs at the same time as activation of pusher 206."  ('018 Patent, c. 10, ll: 5-6.)

The Court concludes that the structure necessary to accomplish the function disclosed in

claim 32 encompasses all the structures in the specification corresponding to that element.  Here,

this includes the various means by which signals are generated to indicate that a basketball is in

play by ejection.  Accordingly, the Court construes the structures disclosed for performing this

function as "a sensor using one or more infrared beams, an ultrasonic sensor, a physical contact

sensor, a capacitance sensor, and a basketball pusher."

**THEREFORE, IT IS HEREBY ORDERED THAT:**

The claims at issue are construed as set forth in this Memorandum Opinion and Order**.**

31

Dated: December 21, 2011

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Judge